IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DIANE PACKARD, the Executrix of the Estate of Edward A. Packard, | ) ) ) | |
| Plaintiff, | ) ) | 4:11CV3199 |
| v. | ) ) ) | |
| STEVEN J. DARVEAU, JR., an Individual, FALLS CITY AREA JAYCEES, a Nebraska Non-Profit Corporation, CARICO FARMS, Incorporated, a Nebraska Corporation, and CORY SNETHEN, an individual, | ) ) ) ) ) ) ) ) | MEMORANDUM AND ORDER ON DEFENDANT SNETHEN'S MOTION TO DISMISS AND DEFENDANT FALLS CITY AREA JAYCEES' MOTION FOR JUDGMENT ON THE PLEADINGS |
| Defendants. | ) ) | |

On July 17, 2012, the plaintiff, Diane Packard, filed a third amended complaint against the defendants, Steven J. Darveau, Jr. (Darveau), Falls City Area Jaycees (FCJC), Carico Farms Incorporated (Carico Farms), and Cory Snethen (Snethen). (See Third Am. Compl., ECF No. 68.) Now before me are Snethen's motion to dismiss the plaintiff's claims against him pursuant to Federal Rule of Civil Procedure 12(b)(6), (ECF No. 91), and FCJC's motion for judgment on the pleadings, (ECF No. 96). For the following reasons, Snethen's and FCJC's motions will be granted.

**I. BACKGROUND**

The third amended complaint alleges as follows. Diane Packard is a resident of Ohio and the executrix of the estate of Edward A. Packard. (Third Am. Compl. ¶¶ 1, 6, ECF No. 68.) Darveau is a resident of Richardson County, Nebraska. (Id. ¶ 7.) FCJC is a Nebraska non-profit corporation with its principal place of business in Falls City, Nebraska. (Id. ¶ 8.) Carico Farms is a Nebraska corporation with its principal place of business in Falls City, Nebraska. (Id. ¶ 9.) Snethen is a resident of Richardson County, Nebraska. (Id. ¶ 10.)

On or about August 5, 2011, FCJC held its annual Demolition Derby and Tractor Pull (the Event) at the Falls City Jaycees Community Field (the Property). (Id. ¶ 12.) The Property is located in Richardson County, Falls City, Nebraska, and is owned by Carico Farms and leased by Snethen. (Id.) Snethen publicly misrepresented that he owned the Property and that he was donating the land to FCJC. (Id. ¶ 13.) Snethen also "gave permission to [FCJC], of which he was a member, to hold a public event on the Property and permitted public improvements to be made to the Property." (Id.)

"The entrance gate to the Event was located three miles south of Falls City, on the South 703 Loop, off of U.S. Highway 73." (Id. ¶ 14.) The third amended complaint refers to the area that includes the entrance to the Event and the intersection of South 703 Loop and U.S. Highway 73 as "the Intersection." (Id.) However, the operative complaint states clearly that the entrance to the Event was "off of U.S. Highway 73," and that patrons reached the entrance to the Event by turning off of U.S. Highway 73 onto South 703 Loop. (See id. ¶¶ 16, 19-22.) In other words, the entrance to the Property is not alleged to intersect with U.S. Highway 73, and there are in fact two distinct, relevant intersections. Therefore, I shall use the term "Intersection" to refer to the intersection between U.S. Highway 73 and South 703 Loop, and I shall use the term "Entrance" to refer to the intersection between South 703 Loop and the Property.[1]

The plaintiff alleges that "[o]n the day of the Event, Defendants knew that the traffic on U.S. Highway 73 would be greatly exacerbated due to traffic being diverted from Interstate 29, which was closed due to flooding and a bridge closure," and "by event patrons using U.S. Highway 73 to get to the Event." (Id. ¶ 15.) During past events at the Property, "either the county police or local police assisted in traffic control." (Id. ¶ 17.) On the date in question, however, FCJC, Carico Farms, and the police all failed to "direct[] or guid[e] the excessive traffic or warn[] motorists of the danger at the Intersection" or the Entrance. (Id.)

On the day of the Event, Edward A. Packard was driving northbound on U.S. Highway 73 in Richardson County, Nebraska, on his motorcycle. (Id. ¶ 21.) He was wearing appropriate safety gear and a helmet, and he "had been an experienced motorcycle rider for over 40 years." (Id. ¶¶ 18, 21.) On the same day, Darveau was driving southbound on U.S. Highway 73 in his pickup truck.

---

[1] When citing the plaintiff's allegations concerning the Intersection, I shall emphasize that those allegations refer not only to the Intersection (as defined by me), but also to the Entrance.

(Id. ¶ 19.) As Darveau approached the Intersection, he proceeded to turn left onto eastbound South 703 Loop with the intention of entering the Event. (Id. ¶¶ 20, 22.) When making his turn, Darveau failed to observe Mr. Packard traveling northbound on U.S. Highway 73, and he caused Mr. Packard to collide with the passenger side of the pickup truck. (Id. ¶ 22.) Mr. Packard suffered fatal injuries in the collision. (Id.) It merits emphasis that the collision is alleged to have occurred at the Intersection (i.e., the intersection between U.S. Highway 73 and South 703 Loop), not at the Entrance (i.e., the intersection between South 703 Loop and the Property).

In Count I of the Third Amended Complaint, the plaintiff alleges that Darveau failed to exercise ordinary care in the operation of his pickup truck, and thereby "directly and proximately caused [the] collision." (Id. ¶ 24.) More specifically, she alleges that Darveau acted negligently by:

   a.   Turning his [v]ehicle into oncoming traffic and failing to yield to traffic which had the right of way;

   b.   Failing to maintain control of his [v]ehicle;

   c.   Traveling at a high rate of speed in excess of [a speed suitable for the] road conditions;

   d.   Operating the [v]ehicle in willful or wanton disregard of the safety of persons or property;

   e.   Failing to maintain attention in operating the [v]ehicle, including but not limited to paying attention to traffic and [to Edward Packard's motorcycle]; and

   f.   Failing to take evasive maneuvers to prevent injuries and harm to others . . . .

(Id.) She also cites a number of Nebraska Statutes and alleges that "Darveau was negligent per se." (Id. ¶¶ 26-34.)

In Count II, the plaintiff alleges that FCJC "owed a duty of care to the public to keep the premises of the Event in a reasonably safe condition for the persons attending the Event and passing in close proximity to the Event and to create a safe entrance and exit to the Event." (Id. ¶ 38.) She adds that FCJC "knew or should have known that public safety was at risk" due to its failure "to provide control or direction of traffic at the Intersection," especially given its "experience at prior

Events" and "the road closures and diversions of traffic" noted above. (Id. ¶ 40.) In addition, she alleges, "As a direct and proximate result of [FCJC's] negligence in failing to keep the premises of the Event and the surrounding area and entrance in a reasonably safe condition, failing to warn drivers of the risk of physical harm at the Intersection and failing to direct and control traffic, [Mr. Packard] was severely injured, [and] said injuries eventually result[ed] in his untimely death." (Id. ¶ 41.)

Counts III and IV state negligence claims against Carico Farms and Snethen, respectively, based on essentially the same grounds stated in Count II. (See id. ¶¶ 44-58.)[2] In Count V, the plaintiff alleges that due to their negligence, each of the defendants is liable for Mr. Packard's wrongful death in accordance with Revised Statutes of Nebraska sections 30-809, 30-810, and 25-1401. (Id. ¶¶ 59-69.)

## II. STANDARD OF REVIEW

"Federal Rule of Civil Procedure 8 requires that a complaint present 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557). Also, although a court must accept as true all factual allegations when analyzing a Rule 12(b)(6) motion, it is not bound to accept as true legal conclusions that have been framed as factual allegations. See id. ("[T]he tenet that a court must

---

[2] The negligence claim against Snethen re-emphasizes Snethen's alleged misrepresentations about the land where the Event was held, his giving FCJC permission to hold the Event on the Property, and his giving permission for "public improvements to be made to the Property." (Third Am. Compl. ¶¶ 52-53, ECF No. 68.) In all other respects, the plaintiff's allegations against Snethen are parallel to the allegations against FCJC. (Compare Third Am. Compl. ¶¶ 38-43, ECF No. 68 with id. ¶¶ 54-58

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). See also Cook v. ACS State & Local Solutions, Inc., 663 F.3d 989, 992 (8th Cir. 2011).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted). In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (brackets omitted).

FCJC's motion for judgment on the pleadings, which is made pursuant to Rule 12(c), will be analyzed using the same standard that applies to Snethen's Rule 12(b)(6) motion. See Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009).

### III.   ANALYSIS

Snethen argues that the claims against him must be dismissed "because [he] did not have a duty to control traffic on the public roadway located close to the property he was leasing" and "because [his] alleged acts and/or omissions were not the proximate cause of the accident as a matter of law." (Snethen's Br. at 4, 8, ECF No. 92.) In support of its motion for judgment on the pleadings, FCJC argues that it, like Snethen, owed "no duty to control, regulate, direct, guide, or warn of the danger of traffic at or around the intersection of U.S. Highway 73 and South 703 [Loop] near the Event." (FCJC's Br. at 10, ECF No. 97 (internal quotation marks omitted).)  I agree that Snethen and FCJC lacked a duty to control the traffic at the intersection, and therefore the plaintiff's claims against them will be dismissed.[3]

---

[3] In light of this conclusion, I shall not analyze Snethen's argument that his alleged acts and omissions "were not the proximate cause of the accident as a matter of law." (Snethen's Br. at 8, ECF No. 92.)  I note in passing, however, that determinations of causation are ordinarily

Each of the plaintiff's claims against Snethen and FCJC are based on the theory that those defendants acted negligently. "In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages." Tolbert v. Jamison, 794 N.W.2d 877, 883 (Neb. 2011) (citing A.W. v. Lancaster County School District 0001, 784 N.W.2d 907 (Neb. 2010)). As noted above, the common argument raised by Snethen and FCJC concerns the plaintiff's inability to satisfy the "duty" element. "Duty is a question whether the defendant is under any legal obligation for the benefit of a particular plaintiff; and in negligence cases, the duty is always the same – to conform to the legal standard of reasonable conduct in light of the apparent risk." Danler v. Rosen Auto Leasing, Inc., 609 N.W.2d 27, 31 (Neb. 2000) (citing Wollen v. State, 593 N.W.2d 729 (Neb. 1999)). See also A.W., 784 N.W.2d at 913. "The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation." Tolbert, 794 N.W.2d at 883 (citing A.W., 784 N.W.2d at 907). See also, e.g., Doe v. Omaha Public School District, 727 N.W.2d 447, 453-54 (Neb. 2007); Danler, 609 N.W.2d at 31.

The Nebraska Supreme Court has "recognized that a common-law duty exists to use due care so as not to negligently injure another person." Danler, 609 N.W.2d at 31-32.[4] However, "the duty of reasonable care generally does not extend to third parties absent . . . other facts establishing a duty." Id. at 32 (quoting Merrick v. Thomas, 522 N.W.2d 402, 406 (Neb. 1994)). For example, where "the avoidance of foreseeable harm requires a defendant to control the conduct of another person," (e.g., Darveau), "the common law has traditionally imposed liability only if the defendant bears some special relationship to the dangerous person or to the potential victim." Id. (quoting Popple v. Rose, 573 N.W.2d 765, 770 (Neb. 1998) abrogated on other grounds, A.W., 784 N.W.2d at 907). See also, e.g., A.W., 784 N.W.2d at 917, 919 (holding, in a case involving a negligence

---

reserved for the trier of fact. See, e.g., Zeller v. Howard County, 419 N.W.2d 654, 672-73 (Neb. 1988).

[4] The complaint does not allege, and the plaintiff does not argue, that Snethen or FCJC breached a statutorily-imposed duty. Indeed, as discussed below, Snethen and FCJC argue persuasively that Nebraska statutes prohibit them from controlling traffic on public roadways, and that the duty to control such traffic rests with the government. (See Snethen's Br. at 7-8, ECF No. 92; Snethen's Reply Br. at 4, ECF No. 94; FCJC's Br. at 8, ECF No. 97.)

action against a school district for a third party's assault on a student, that instructors have a well-established duty to supervise and protect students against risks that arise "within the scope of [the] relationship" between the student and the school district).  Thus, to avoid dismissal, the plaintiff must allege a special relationship between Snethen and FCJC (on the one hand) and either Darveau or Edward Packard (on the other), or other facts establishing a duty on the part of Snethen and FCJC. See Danler, 609 N.W.2d at 32 ("In order for us to determine that Danler was owed a duty by Rosen in this case, there must be allegations of some special relationship or other facts to establish a duty on the part of Rosen.")

The operative complaint does not allege that there is any relationship whatsoever between the two defendants and Mr. Packard, and the only alleged relationship between the two defendants and Darveau is that at the time of the collision, Darveau was on his way to an event being held by FCJC on property leased by Snethen.  The plaintiff refers me to no authority suggesting that such a tenuous connection amounts to a "special relationship" that could support a finding that Snethen or FCJC owed a duty to Mr. Packard.[5]  Thus, the plaintiff's claims against Snethen and FCJC must be dismissed unless the third amended complaint alleges "other facts" that establish a duty on the part of those two defendants.

The plaintiff alleges that "[FCJC and Snethen] owed a duty of care to the public to keep the premises of the Event in a reasonably safe condition for the persons attending the Event and passing in close proximity to the Event and to create a safe entrance and exit to the Event." (Third Am. Compl. ¶¶ 38, 54, ECF No. 68.)  She also alleges that FCJC and Snethen breached their duty by failing to "properly control, regulate, direct, guide or warn of the danger of the traffic at or around the Intersection [and the Entrance] of the Event." (Id. ¶¶ 39, 55.)  The operative complaint contains no allegations that could support a conclusion that the collision was caused by an unsafe condition on the Property.  Thus, it is irrelevant whether Snethen and FCJC "owed a duty of care to the public to keep the premises of the Event in a reasonably safe condition" for persons in or around the

---

[5] On the contrary, the plaintiff argues that the caselaw that discusses "special relationship" as a basis for establishing a common-law duty to prevent harm caused by a third person "does not apply" in this case. (Pl.'s Response to Snethen's Br. at 4-5, ECF No. 93; see also Pl.'s Response to FCJC's Br. at 7-8, ECF No. 107.)

7

property. Also, the collision did not happen at the Entrance to the Event, or on the Property, but rather at the intersection of U.S. Highway 73 and the South 703 Loop. (See id. ¶¶ 14, 19-22.) Therefore, it is irrelevant whether Snethen and FCJC owed a duty to "create a safe entrance and exit to the Event" or to "control, regulate, direct, guide, or warn of the danger of the traffic" at the Entrance. The plaintiff's claims against Snethen and FCJC depend, then, on whether Snethen and FCJC had a duty to control, regulate, direct, guide, or warn of the danger of the traffic at the Intersection where the collision occurred.

Snethen and FCJC argue persuasively that they owed no such duty. First, Snethen and FCJC cite Nebraska statutes that authorize various government authorities to control highway traffic. (See Snethen's Br. at 7-8, ECF No. 92 (citing, inter alia, Neb. Rev. Stat. §§ 60-680 ("Any local authority with respect to highways under its jurisdiction and within the reasonable exercise of the police power may . . . [r]egulate traffic by means of peace officers or traffic control devices . . . ."); 39-1337 ("The construction, maintenance, protection, and control of the state highway system shall be under the authority and responsibility of the [Department of Roads] . . . ."); 39-1402 ("General supervision and control of the public roads of each county is vested in the county board. . . .")); FCJC's Br. at 8, ECF No. 97.) See also Neb. Rev. Stat. §§ 60-6,121 ("Local authorities in their respective jurisdictions shall place and maintain such traffic control devices upon highways under their jurisdictions as they deem necessary to indicate and to carry out the provisions of the Nebraska Rules of the Road or to regulate, warn, or guide traffic."); 60-6,127(1) ("No person shall place, maintain, or display upon or in view of any highway any unauthorized sign, signal, light, marking, or device which purports to be, is an imitation of, or resembles a lawful traffic control device[,] . . . which uses the words stop or danger prominently displayed, which implies the need or requirement of stopping or the existence of danger, which attempts to direct the movement of traffic, [or] which otherwise copies or resembles any lawful traffic control device . . . ."); 60-6,127(4) ("Every such prohibited sign, signal, or marking is hereby declared to be a public nuisance . . . ."). As I will discuss in more detail below, these statutes indicate that the government bears the responsibility for controlling traffic at the Intersection, not Snethen and FCJC.

Next, Snethen cites cases from "across the country" that have rejected the notion that private entities have a duty to control, regulate, direct, guide, or warn of dangers presented by traffic on public roadways.[6] (See Snethen's Br. at 5-7, ECF No. 92 (citing Ferreira v. Strack, 636 A.2d 682 (R.I. 1994) (holding that a church had no duty to control traffic on public roadway abutting the church, even though the church had made a prior request for public traffic control to protect its parishioners); Dixon v. Houston Raceway Park, Inc., 874 S.W.2d 760 (Tex. App. 1994) (holding that because accident occurred on public roadway outside the control of the raceway, the raceway owed no legal duty to motorist who collided with a vehicle that was attempting to turn onto the raceway's premises); Haymon v. Pettit, 880 N.E.2d 416 (N.Y. 2007) (holding that baseball stadium owner owed no duty to a non-patron who was struck by a vehicle while chasing a foul ball into a street adjacent to the stadium, even though the stadium had a policy of providing free tickets to persons who retrieved foul balls outside the stadium, because the stadium could not control the public street and the dangers inherent in the street existed independent of the policy); Walton v. UCC X, Inc., 640 S.E.2d 325 (Ga. Ct. App. 2006) (holding that landlord did not owe a duty to tenant who was struck by a vehicle while crossing a roadway that separated his apartment from a parking lot because the landlord did not control the roadway or the manner in which the tenant crossed it, and the landlord did not prevent the tenant from making other arrangements to reach his apartment); Wall v. Skyline Drive Motel, Inc., No. 2-05-079, 2006 WL 1562839 (Tex. App. June 8, 2006) (holding that motel adjacent to highway did not owe duty to warn passing motorists of danger caused by motel guests entering the highway); Portelli v. Garcia, 756 N.Y.S.2d 415 (N.Y. Sup. Ct. 2003) (rejecting argument raised by plaintiff, who was struck by a vehicle on an adjacent street while waiting to enter defendant's station, that the station owed a duty to provide safe access to its premises to customers as an extension of its duty to provide safe premises); Zapata v. Cormier, 858 So.2d 601 (La. Ct. App. 2003) (holding that bar owner did not owe a duty to customer who was struck and killed while crossing highway outside the bar because the accident occurred on the highway, not on the bar's premises, and the owner had no control over the highway); Owens v. Kings Supermarket, 243 Cal. Rptr. 627 (Cal. Ct. App. 1988) (holding that supermarket did not owe a duty to a customer injured

---

[6] No party has referred me to a Nebraska case that squarely addresses this issue.

by the negligence of a third party on an adjacent public street because the supermarket had no control over the public street); Laumann v. Plakakis, 351 S.E.2d 765 (N.C. Ct. App. 1987) (holding that business owner did not have a duty to provide a crossing guard, warning signals, or other traffic controls on an adjacent city street, nor did its duty to keep its premises safe extend to the public street); Mahle v. Wilson, 323 S.E.2d 65 (S.C. Ct. App. 1984) (holding that skating rink adjacent to highway had no duty to request that highway department post speed limit signs or furnish a pedestrian crosswalk on the highway).

      Finally, both Snethen and FCJC discuss Ferreira v. Strack, 636 A.2d 682 (R.I. 1994), at length, and FCJC argues that the analytical factors discussed in Ferreira weigh in favor of a finding that no duty was owed to Mr. Packard. (See Snethen's Br. at 5, ECF No. 92; FCJC's Br. at 5-9, ECF No. 97.) In Ferreira, a group of parishioners seeking to attend a midnight church service parked their car in a lot that was separated from the church by a public highway. As they crossed the street to return to their car after the service, two members of the group were struck by a driver who was later determined to be intoxicated. On prior occasions, the church had requested that a police officer be dispatched to control traffic on the highway, but they had not made such a request on the night in question. The parishioners brought a negligence action against the church, arguing that the church owed them a duty to control traffic on the public highway "because the church knew that a substantial number of parishioners would cross [the highway] to reach the parking lot late at night after Mass ended," and, alternately, that "the church voluntarily assumed a duty to patrol traffic by its past conduct of occasionally contacting the police and requesting the assignment of traffic officers." 636 A.2d at 684. In rejecting the parishioners' theory that the church owed a duty, the Rhode Island Supreme Court noted that the "great weight of authority holds" that landowners have no duty "to one who is struck by a vehicle while crossing an adjacent public way." Id. at 686. The court then adopted this majority rule based on the following considerations: "First and most importantly, the duty to control traffic has traditionally rested squarely with the government," which "weighs heavily against the imposition of a duty on an abutting landowner to control traffic." Id. at 686-87. "Second, the church had no control over the property on which the injury occurred." Id. at 687. The court added, "The fact that a landowner may request public traffic control on a public street does not vest in that landowner the personal right or obligation to control such a public way."

Id. "Third, the church had no control over the instrumentality causing the injury." Id. "Fourth, [the court] express[ed] concern that if [it] were to impose a duty upon a landowner to patrol traffic on public ways, the line which would cut off the landowner's liability then becomes nearly impossible to draw." Id. (quoting Wofford v. Kennedy's 2nd Street Co., 649 S.W.2d 912, 914 (Mo. Ct. App. 1983)) (internal quotation marks and brackets omitted). "Fifth, [and finally,] the expense of traffic control should be borne by the public at large and not by individual landowners abutting public ways." Id. The court also noted, "Having no duty itself to control traffic, neither would the church have a duty to contact the police and request the stationing of a traffic officer on [the highway]." Id. at 687-88. In addition, the court rejected the parishioners' argument that either "the lack of adequate parking [or] the foreseeability that many parishioners would park in the nearby lot requiring them to cross [the highway] warrant[] the imposition of a duty to control traffic on a public highway," and it concluded that "[t]he same principles that militate against the duty to control traffic on public highways would also preclude the gratuitous assumption of such a duty." Id. at 688.

    I find that Snethen and FCJC owed no duty to control, regulate, direct, guide, or warn of the danger of the traffic at the Intersection where the collision occurred. The Nebraska Supreme Court has indicated that "whether a duty exists is a policy decision" based on "legislative facts, not adjudicative facts arising out of the particular circumstances of the case." A.W. v. Lancaster County School Dist. 0001, 784 N.W.2d 907, 915, 916 (Neb. 2010) (emphasis omitted). See also id. at 914 ("Duty rules are meant to serve as broadly applicable guidelines for public behavior, i.e., rules of law applicable to a category of cases." (footnote omitted)). Thus, it seems to me that the Nebraska Supreme Court would endorse the approach taken by the court in Ferreira, which involves the weighing of broad policy considerations and rules of law that apply across cases to determine whether a common-law duty exists. Furthermore, I agree with FCJC that the guidelines discussed in Ferriera are instructive in this case, and that each weighs in favor of the conclusion that FCJC and Snethen owed no duty to Mr. Packard. First, as the statutes cited by Snethen and FCJC demonstrate, the duty to control traffic on the Nebraska public roadways rests with the government. Second, neither Snethen nor FCJC had any control over the property where the collision occurred. Third, neither Snethen nor FCJC had any control over the instrumentality that caused Mr. Packard's fatal injuries (i.e., Darveau's pickup truck). Fourth, if a duty were imposed upon Snethen and FCJC to

11

control, regulate, direct, guide, or warn of the danger of traffic at the Intersection, it would become difficult, if not impossible, to draw a line that would cut off the defendant's liability. This concern is perhaps even more salient here than in Ferreira, because in the instant case the accident did not occur at the Entrance to the Event, but rather at an intersection some unspecified distance away. Finally, the expense of traffic control on the public roadways should be borne by the public, not by individuals who own or control nearby land. In light of these principles, and in light of the fact that the vast majority of courts have reached the same conclusion in analogous cases, I find that neither Snethen nor FCJC owed a duty to Mr. Packard. Given this finding, the plaintiff's negligence claims against Snethen and FCJC must be dismissed.

The plaintiff argues that Snethen's and FCJC's motions should be denied because all of the cases cited by the defendants involve situations where "the dangerous condition which proximately caused the plaintiff['s] injury was out of the control of the landowner or occupier," whereas here the "uncontrolled and unmonitored traffic in and around the entrance to [the] Event . . . was in Snethen's [and FCJC's] control." (Pl.'s Response to Snethen's Br. at 5, ECF No. 93; see also Pl.'s Response to FCJC's Br. at 11, ECF No. 107 (adding that Snethen and FCJC controlled "the date and time of the Event, traffic flow into the entrance of the Event, serving of alcohol at the Event, [and] parking for, hours of and admission to the Event").) The plaintiff's argument assumes that Snethen and FCJC had an obligation to control traffic on the public roadway where the accident occurred, and as I have explained, neither Snethen nor FCJC had such a duty. Also, the plaintiff's suggestion that the collision was caused by factors that were within Snethen's and FCJC's control (such as the timing of the Event, the serving of alcohol, etc.) is not supported by the allegations in the operative complaint. Put simply, the third amended complaint does not allege facts showing plausibly that a dangerous condition on the Property (or otherwise within Snethen's and FCJC's control) caused Mr. Packard's injuries.

The plaintiff also argues that the instant case should be governed by the analysis set forth in Holiday Rambler Corp. v. Gessinger, 541 N.E.2d 559 (Ind. Ct. App. 1989). (See Pl.'s Response to Snethen's Br. at 6-9, ECF No. 93; see also Pl.'s Response to FCJC's Br. at 11-13, ECF No. 107.) In Gessinger, a motorcyclist was seriously injured in an accident on a public highway adjacent to the defendant's plant. The accident occurred when Danny Slabaugh, the defendant's employee, was

leaving the plant. Slabaugh attempted to enter the southbound lane of the highway by making a left hand turn from a driveway leading out of the plant, but he stopped approximately eight feet into the northbound lane of the highway to avoid hitting two vehicles that were entering the same highway from a second driveway. A driver heading north on the highway attempted to avoid hitting Slabaugh's truck, but she skidded into the truck and ultimately spun into the southbound lane, where she collided with Gessinger's motorcycle. The record showed that the highway was a two lane asphalt road with a 55 mile-per-hour speed limit; there were four driveways leading from the plant onto the highway within a space of 800 feet; that the accident occurred at the time when the plant's employees' shift was ending; and that the employees use all four driveways to travel in either direction on the highway. The Indiana Court of Appeals concluded that the plant had a duty to the public traveling on the adjacent highway "to prevent injury to travelers upon the highway from any unreasonable risks created by the property's dangerous condition which the landowner knew or should have known about." 541 N.E.2d at 562 (emphasis added). In reaching this conclusion, the court distinguished prior cases holding that the law imposes no duty upon a business to guard against injuries that are caused by persons over whom it has no control and that occur off of the business's premises. See id. at 561-62. The court explained that in contrast to these prior cases, here the plant had "a relationship to the agency causing the problem" because Slabaugh was one of its employees; Slabaugh caused the accident when trying to avoid hitting other employees; and the plant was responsible for creating the dangerous condition by "provid[ing] its employees four driveways within eight hundred feet," "allow[ing] hundreds of people to exit at 3:00 p.m. each day onto a state road with a speed limit of fifty-five miles per hour," and allowing employees to exit "from the driveways in both directions with no established traffic patterns." Id. at 562.

       Unlike Gessinger, in the instant case there are no allegations that a dangerous condition on the Property created an unreasonable risk to the traveling public. The third amended complaint merely alleges that event patrons would "exacerbate" the traffic on U.S. Highway 73, that traffic was already "exacerbated due to traffic being diverted from Interstate 29," and that patrons coming from a certain direction would be required to make a left turn across oncoming traffic on U.S. Highway 73. (See Third Amended Compl. ¶¶ 15-16, ECF No. 68.) Relatedly, the court's holding in Gessinger depends upon a finding that the plant had a "relationship to the agency that caused the

accident because the plant could control the timing and volume of traffic leaving the plant, the number of driveways leading away from the plant, and the traffic patterns of the cars using those driveways. Here, in contrast, Snethen and FCJC could not control traffic on U.S. Highway 73. They had no control over the volume of traffic using the highway, they could not control the direction of the traffic, and they could not control whether a driver might attempt to turn left across traffic on U.S. Highway 73 in order to drive on South 703 Loop. Nor could they control the fact that traffic had been diverted onto U.S. Highway 73 from other highways. More particularly, they had no control over the movements of either Darveau or Mr. Packard at the time of the collision. While the plant in Gessinger had a responsibility to investigate and correct the conditions on its property that caused the accident, in the case before me there are no allegations that conditions on the Property caused the accident, and Smethen and FCJC had no responsibility to investigate and alter the conditions on the public roadway away from the Entrance to the Event.

In short, Gessinger does not hold that a private entity has a duty to control, regulate, direct, guide, or warn of the danger of the traffic on a public highway; rather, it holds that a private entity has a duty to correct known dangerous conditions on its own property that threaten traffic on a public roadway. The case simply does not avail the plaintiff.[7]

The plaintiff argues next that Snethen and FCJC incurred a duty to Mr. Packard because the risk posed by Event-related traffic on U.S. Highway 73 was foreseeable, adding that "a common law duty arises from FCJC's prior pattern and practice of having traffic controllers for its events." (Pl.'s Response to FCJC's Br. at 9, ECF No. 107; see also id. at 13-14; Pl.'s Response to Snethen's Br. at 2, 8, ECF No. 93.) The plaintiff maintains that Ferreira v. Strack supports her argument because "[t]he Ferreira court stated that because of the past conduct of the church in obtaining a law officer to assist with traffic, . . . the church had a duty to warn pedestrians when it chose not to have a traffic officer present." (Pl.'s Response to FCJC's Br. at 9, ECF No. 107 (emphasis in original).) As I noted above, however, Ferreira holds that the church had no such duty. See 636 A.2d at 688

---

[7] The plaintiff also attempts to draw an analogy between the instant case and Esfahani v. Five Star Productions, Inc., No. A-97-1246, 1999 WL 273996 (Neb. Ct. App. May 4, 1999), wherein a performer sued a promoter of a public performance for negligence after she fell into an uncovered orchestra pit. (See Pl.'s Response to Snethen's Br. at 9-10, ECF No. 93; Pl.'s Response to FCJC's Br. at 6-7, ECF No. 107.) The case is inapposite and merits no discussion.

("Alternatively, plaintiffs argue that even if the church did not have a duty to patrol traffic, the church assumed such a duty by requesting traffic control by the police on prior occasions. Once the church assumed that duty, plaintiffs argue, parishioners relied upon the church to contact officials in the future, and therefore, the church had a duty to warn parishioners when the church failed to perform its duty on other occasions. We disagree. The same principles that militate against the duty to control traffic on public highways would also preclude the gratuitous assumption of such a duty."). Furthermore, the Nebraska Supreme Court has held that "foreseeability is not a factor to be considered by courts when making determinations of duty." A.W. v. Lancaster County School Dist. 0001, 784 N.W.2d 907, 918 (Neb. 2010). Allegations that police traffic controllers had been obtained during prior events and that Snethen and FCJC knew or should have known of the risks at the Intersection do not establish that Snethen and FCJC had a duty to control traffic at the Intersection.

The plaintiff's remaining arguments in opposition to Snethen's and FCJC's motions merit little comment. The plaintiff appears to argue that Snethen's alleged misrepresentations about his ownership of the Property and his "oversight of the Property and Event" somehow give rise to a duty, (see Pl.'s Response to Snethen's Br. at 4, ECF No. 93; Pl.'s Response to FCJC's Br. at 4-5, ECF No. 107), but I fail to see how these allegations are material. The plaintiff also argues that FCJC's motion for judgment on the pleadings is improper because FCJC failed to file "a motion to dismiss when the timing was procedurally appropriate," (see Pl.'s Response to FCJC's Br. at 3, ECF No. 107), but I am not persuaded that the motion is untimely, see Fed. R. Civ. P. 12(c) ("After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings.").

The third amended complaint does not allege facts showing plausibly that Snethen or FCJC owed a duty to Mr. Packard to control traffic or provide warnings at the public intersection where the collision occurred. Nor does it allege facts showing plausibly that the accident was caused by a dangerous condition that emanated from Snethen's and FCJC's property or was otherwise under their control. The plaintiff's claims against Snethen and FCJC will therefore be dismissed.

In light of the foregoing, Snethen's motion to stay discovery, (ECF No. 112), will be denied as moot. The remaining parties may seek to schedule a status conference to evaluate the progression deadlines if they deem it necessary to do so.

**IT IS ORDERED** that:

1.  Cory Snethen's motion to dismiss, (ECF No. 91), is granted;

2.  Falls City Area Jaycees' motion for judgment on the pleadings, (ECF No. 96), is granted;

3.  Cory Snethen's motion to stay discovery, (ECF No. 112), is denied as moot.

Dated December 5, 2012.

BY THE COURT

*Warren K. Urbom*

Warren K. Urbom
United States Senior District Judge